**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**


Hardy Industrial Technologies, LLC,   )    **CASE NO. 1:12 CV 3097**
       )
       **Plaintiff,**   )    **JUDGE PATRICIA A. GAUGHAN**
       )
    **Vs.**   )
       )
BJB, LLC d/b/a Agri Trading,   )    <u>**Memorandum of Opinion and Order**</u>
       )
    **Defendant.**   )


<u>**INTRODUCTION**</u>

This matter is before the Court upon Plaintiff's Motion for Immediate Stay of Arbitration and for Preliminary Injunction (Doc. 3). This case arises out of the purchase and sale of recovered corn oil. For the reasons that follow, the motion is GRANTED in PART and DENIED in PART. The Court hereby compels to arbitration disputes arising under the purchase order governing sales in 2011. Disputes for sales allegedly to have occurred in 2012 will be settled by this Court after arbitration concludes.

<u>**FACTS**</u>

1

On December 21, 2012, plaintiff Hardy Industrial Technologies, LLC ( "Hardy") filed a Complaint for Injunctive Relief and Declaratory Judgment against defendant BJB, LLC dba Agri Trading ("Agri Trading").

The parties are engaged in the business of buying and selling animal fats and oils.  From time to time, Agri Trading purchased vegetable oils from Hardy and has furnished rail tank cars to Hardy for shipment from Hardy's Painesville, Ohio facility.

According to Agri Trading, the parties had a prior business relationship.  In April of 2011, a broker with Sunbelt Commodities, Inc. ("Sunbelt') contacted Agri Trading and indicated that Hardy was interested in selling recovered corn oil to be loaded and shipped in Agri Trading's rail cars.  After reaching an agreement with Hardy on the main terms of the deal, Agri Trading provided Sunbelt with an Agri Trading contract number for the transaction.  In response, Sunbelt sent Agri Trading a "Confirmation of Sale and Purchase."  The document included: the main terms of the contract, Sunbelt's broker number, Hardy's confirmation number, and Agri Trading's contract number.  The document further indicated that "all trades are subject to the American Fats and Oils Association ("AFOA") Trading Rules."  Subsequently, Agri Trading sent Hardy a written "Purchase Contract Confirmation," which confirmed the main terms of the agreement.  The document also provides that the purchase is made "under the trade rules of the [AFOA] and both parties agree to be bound thereby."  According to Hardy, it dealt directly with Agri Trading, and Sunbelt was used based on a request by Agri Trading.  Hardy claims that Sunbelt was merely "kept informed" of the negotiations.  On certain occasions, Hardy specifically requested that Agri Trading send Hardy a purchase contract confirmation.

Between April 26 and July 28, 2011, the aforementioned process occurred on six

2

occasions. According to Agri Trading, each of the six contracts were negotiated and documented as set forth above. The contracts were identical with the exception of the quantity, price, and date of shipment. In total, Hardy loaded 100 of Agri Trading's rail cars with corn oil, shipped all 100 cars to Agri Trading and, thereafter, Agri Trading paid Hardy in full.

On the other hand, Hardy's representatives aver that the separate transactions between Hardy and Agri Trading were not handed similarly. According to Hardy, Agri Trading did not always provide a purchase order for the material and did not always purchase the quantities it indicated that it intended to purchase. The affidavit of one of Hardy's salesmen is consistent with this testimony. The salesman also indicates that actual sales transactions did not comport with Agri Trading's purchase orders. According to Hardy, Agri Trading did not always provide sufficient rail cars to Hardy so that Hardy could meet the terms of the agreements. In other words, there was no "consistent pattern" to the transactions between the parties.

According to Agri Trading, on August 18, 2011, the parties entered into a seventh contract for the sale and purchase of recovered corn oil. The terms were identical to the prior six agreements, with the exception of the quantity, price, and date of shipment. The seventh contract called for the shipment of 104 rail cars of recovered corn oil to be shipped throughout October, November, and December of 2011. The agreement was memorialized in writing in the Sunbelt Confirmation of Sale and Purchase No. 120004. The document identifies Hardy's seller confirmation number as C1-C104 and Agri Trading's contract number as 319298. The agreement was further memorialized by Agri Trading's Purchase Contract Confirmation No. 319298 ("Purchase Order 319298"). Hardy shipped only 67 of the 104 cars of corn oil.

Both the Sunbelt document and Agri Trading's purchase order contain language

3

incorporating the AFOA trade rules. Specifically, the purchase order provides,

> This purchase is made under the trade rules of the Grain and Feed Dealers National Association; or of the National Soybean Processors Association or of the American Dehydrators Association; or of the National Renderers Association; or NEGA #2, or GAFTA #100, or AFOA, depending on which governs the commodity hereby sold, except as modified herein, and both parties agree to be bound thereby. This documents and said rules contain the entire agreement.

Rule 3 of the AFOA's trade rules provides as follows:

> All disputes and controversies arising under these rules, which pertain to imported and domestic vegetable oils, shall be settled by arbitration as provided in the "American Fats and Oils Association, Inc. – Arbitration Rules" as amended from time to time all of which are hereby incorporated in and made part hereof.

Hardy was not a member of AFOA.

On September 23, 2011, the parties purportedly entered into an eighth contract. There are two copies of Agri Trading's Purchase Confirmation No. 319527 ("Purchase Order 319527"). Pursuant to one of the versions, Hardy was to provide 416 rail cars of corn oil during 2012. The document is dated September 23, 2011. Hardy acknowledges that Agri Trading sent Hardy this document. On the other hand, the second version of Purchase Order 319527, which is also dated September 23, 2011, calls for the purchase of 520 rail cars of recovered corn oil in 2012.

There are also two versions of a document purportedly memorializing this transaction that were sent by Sunbelt. Both versions are dated September 23, 2011 and both contain the same "Broker's No." The internal Sunbelt order number is 120016. On one version, the parties purportedly agreed to the purchase and sale of 410 rail cars of corn oil. In the other version, the parties purportedly agreed to the purchase and sale of 520 rail cars.

Hardy points out that it did not sign the seventh purchase order or either version of the

4

eighth purchase order.  It is undisputed that Hardy did not provide any corn oil under either version of Purchase Order 319527.  In fact, in 2011, plaintiff notified defendant that it could not provide it with corn oil because plaintiff's supplier would not be able to supply corn oil to plaintiff.  In 2011, defendant acknowledged plaintiff's notice that it could not provide defendant with corn oil.

It appears that all versions of the documents relevant to the purchase and sale of corn oil to be delivered in 2012 contain language incorporating the AFOA rules.

According to Agri Trading, Hardy never objected to any of the terms stated in any of the Purchase Contract Confirmations.  Nor is Agri Trading aware of any facts suggesting that Hardy objected to the Sunbelt Confirmations of Sale and Purchase.  In fact, in email correspondence with Sunbelt, Hardy referred to previous Sunbelt Confirmations of Sale and Purchase as "contracts."

On the other hand, Hardy's president avers that Hardy specifically objected on several occasions to the terms contained in Agri Trading's purchase orders and noted its refusal to sign the purchase orders.  The salesman sent email correspondence to Agri Trading indicating, "as has been the case for all Agri Trading rail and ruck shipments, we have not signed Agri Trading [purchase orders] as submitted....  However, we will not fill [purchase order] 320458 in accordance with the first page verbiage or the Term and Conditions on the back of [the purchase order."  A second email confirms that Hardy would not agree to any terms and conditions contained in Agri Trading's purchase orders.  Both of these emails, however, were sent after the purchase orders for corn oil were sent and neither involved the specific corn oil purchase orders at issue.  On the other hand, Agri Trading notes that the parties addressed a dispute surrounding

weight discrepancies involved in pervious corn oil purchase orders by reliance on the AFOA rules.  Hardy further referenced the rules in addressing a problem with a sample analysis.

On November 20, 2012, defendant submitted a demand for arbitration to the American Arbitration Association (AAA) seeking an award of $1,539,562.50. The arbitration demand states that the claimant (identified as defendant herein) is "claiming amount listed for nonperformance of plaintiff's obligation to produce and provide inedible corn oil for the full 2012 calendar contract, plus arbitration costs and attorneys' fees."  The document submitted to the AAA, on which Agri Trading bases its claim for arbitration is the first version of Purchase Order Purchase 319527, *i.e.*, the purchase order reflecting the alleged purchase of 416 rail cars of corn oil.  Agri Trading did not submit the purchase order for the seventh contract, *i.e.*, the one for 104 rail cars, or the second version of Purchase Order 319527, reflecting the alleged purchase of 520 rails cars.

Plaintiff did not receive the original demand for arbitration from defendant, but received a message from the AAA on November 28, 2012 by electronic mail regarding the initiation of the arbitration proceeding. On November 30, 2012, the AAA provided to plaintiff by electronic mail a copy of the demand for arbitration and a copy of the first version of Purchase Order No. 319527.

In response, Hardy filed the instant lawsuit.  The Complaint sets forth two claims.  Count one seeks injunctive relief and alleges that plaintiff  never agreed to arbitrate any claims pursuant to Purchase Order No. 319527, and that it is entitled to preliminary and permanent injunctive relief enjoining defendant from pursuing arbitration of its claims pursuant to "that document."  Count two seeks a declaratory judgment of the rights and duties of the parties.  In particular,

6

plaintiff asks the Court to enter judgment declaring that no contract was formed between the parties for the 416 rail cars of corn oil to be shipped from Painesville, Ohio from January through December 2012 pursuant to Purchase Order No. 319527, and the parties did not agree to arbitrate the dispute submitted by defendant to the AAA for arbitration.  Agri Trading filed an Answer and Counterclaim.  The Counterclaim contains three claims for relief.  Count one seeks a declaratory judgment of the rights and duties of the parties under the seventh and eighth agreements.  Count two seeks an order staying this case and compelling the matter to arbitration. Count three is a claim for breach of contract.

Plaintiff moves for an immediate stay of arbitration or, alternatively, for a preliminary injunction.  Defendant opposes the motion.  Plaintiff has also provided information in its reply brief that the AAA has held the arbitration proceeding in abeyance.

### ANALYSIS

The Federal Arbitration Act ("FAA") applies as this is a transaction in commerce.  The FAA provides:

> A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2.  The FAA embodies a clear federal policy requiring arbitration unless the agreement to arbitrate itself is revocable.  *Perry v. Thomas*, 482 U.S. 483, 489 (1987). "[Q]uestions of arbitrability must be addressed with a healthy regard for the federal policy

7

favoring arbitration." *Moses H. Cone Memorial Hosp. v. Mercury Construction Corp.*, 460 U.S. 1, 24 (1983).

> The Arbitration Act establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability.

*Id.* at 24-25.

When considering a motion to compel arbitration, if a court is "satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement." 9 U.S.C. § 4.  Questions related to the formation of the agreement to arbitration are for the court. *See*, *Granite Rock Co. v. International Brotherhood of Teamsters*, 130 S.Ct. 2847 (2010)(issue of whether an agreement to arbitrate was *formed* is for the Court). *Compare*, *Buckeye Check Cashing, inc. v. Cardegna*, 546 U.S. 440 (2006)(arbitration provision severable where party raises issue that illegality of one provision invalidates entire contract; thus issue is for arbitrator to decide).

In ruling on a motion to compel arbitration,

> Section 4 of the Arbitration Act requires the court to engage in a limited review.  The first step of that review is to determine if a valid agreement to arbitrate exists between the parties.  If a valid arbitration agreement exists, the court must determine if the specific dispute falls within the substantive scope of the agreement.

*Harmer v. Doctor's Associates, Inc.*, 781 F.Supp. 1225, 1228 (E.D. Mich.1991) (internal citations omitted).  *See also AT&T Technologies, Inc. v. Communications Workers of Am.*, 475 U.S. 643, 649 (1986) (holding that "in deciding whether the parties have agreed to submit a

8

particular grievance to arbitration, a court is not to rule on the potential merits of the underlying claims"). A motion to compel arbitration should be granted "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582-83 (1960). While the court considers the facts in the light most favorable to the plaintiff, ultimately the party resisting arbitration bears the burden of proving that the claims at issue are unsuitable for arbitration. *Green Tree Fin. Corporation-Alabama v. Randolph*, 531 U.S. 79, 91 (2000); *Anderson*, 316 F. Supp. 2d at 558.

1. Currently pending arbitration

Hardy argues that Agri Trading should be enjoined from pursuing the currently pending arbitration. In the alternative, Hardy requests that the Court stay the arbitration. According to Hardy, the parties never agreed to arbitrate any dispute for the sale and purchase of corn oil under Purchase Order 319527 because the parties never entered into a contract at all. Hardy claims that it did not sign any purchase order. Nor did it commit to providing corn oil in any other fashion. Hardy further points out that it did not deliver corn oil or receive payment from Agri Trading for the corn oil. Moreover, Hardy points out that the terms of the Purchase Order submitted to the arbitrator differ from the terms Agri Trading attempts to enforce before this Court. In addition, the Confirmation of Sale and Purchase submitted by Sunbelt also differs form the version Agri Trading relies on here.

In response, Agri Trading argues that the course of dealing between the parties establishes a finding that a contract existed for the delivery of 520 rail cars of corn oil during 2012. According to Agri Trading, the parties concluded negotiations and agreed upon the

9

essential terms of the contract.  Agri Trading argues that Hardy wrongfully ignores the participation of Sunbelt in the transaction.  Sunbelt sent a confirmation of the sale and purchase to both Agri Trading and Hardy.  Agri Trading points out that the Sunbelt confirmation contains a "seller's confirmation number," thereby evidencing Hardy's intent to be bound.  As such, these acts constitute "acceptance" of Agri Trading's offer.  Agri Trading further notes that Hardy never objected to Purchase Order 319527 or Sunbelt's corresponding Confirmation of Sale and Purchase.  Agri Trading argues that in the past, Hardy has referred to Sunbelt's Confirmations of Sale and Purchase as "contracts."  In addition, Agri Trading claims that the lack of a signature on behalf of Hardy does not render the parties' agreement unenforceable.

"Under section 2 of the FAA, an arbitration agreement is 'valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.' [The] enforceability of an arbitration agreement [is reviewed] according to the applicable state law of contract formation."  *Morrison v. Circuit City Stores, Inc.*, 317 F.3d 646 (6 th Cir. 2003)(citing, *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 943-44, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995)).  Here, the parties do not appear to dispute that Ohio law applies to the analysis.

Ohio law defines the elements of a contract as follows:

'A contract is generally defined as a promise, or a set of promises, actionable upon breach.  Essential elements of a contract include an offer, acceptance, contractual capacity, consideration (the bargained for legal benefit and/or detriment), a manifestation of mutual assent and legality of object and of consideration.'

*Kostelnick v. Helper*, 770 N.E.2d 58, 61 (Ohio 2002) (quoting *Perlmuter Printing Co. v. Strome, Inc.,* 436 F.Supp. 409, 414 (N.D. Ohio 1976)).

Here, based on the facts and arguments presented by the parties, the Court cannot say that

10

the parties reached an agreement to arbitrate under either Purchase Order 319527 or Sunbelt's corresponding Confirmation of Sale and Purchase.  As set forth above, there are two versions of Purchase Order 319527, which call for the sale and purchase of vastly different quantities of corn oil.  One version involves the sale and purchase of 416 rail cars of corn oil.  This is the "contract" that Agri Trading submitted to the arbitrator as the document that formed the basis of the parties' dispute.  The other version of Purchase Order 319527 involves the sale and purchase of 520 rail cars of corn oil.  This is a significantly different quantity than is reflected in the version of the purchase order submitted to the arbitrator and purports to require the sale and purchase of 20% more corn oil.   This version of Purchase Order 319527 is what Agri Trading claims forms the basis of its claims in this case.

Similarly, there are two versions of Sunbelt's Confirmation of Sale and Purchase.  One version involves 520 rail cars, while the other (dated the same and containing the same order number) involves the purported sale and purchase of 416 rail cars.  Agri Trading argues to the Court that the Sunbelt Confirmation of Sale and Purchase involving 520 rail cars is an enforceable agreement containing an arbitration provision.  Agri Trading, however, wholly ignores the fact that it submitted the version of Purchase Order 319527 involving 416 rail cars to arbitration.  In fact, Agri Trading does not mention or acknowledge that various forms of the parties' supposed "agreement," which contain materially different terms, even exist.

Agri Trading argues before the Court that the parties agreed to the quantity of 520 rail cars based on a course of dealing.  The course of dealing described by Agri Trading, however, never involved the exchange of multiple versions of the same purchase order number or multiple versions of the same Sunbelt Confirmation of Sale and Purchase.  Based on the existence of

various forms of the parties' supposed agreement, and the fact that Agri Trading wholly ignored and failed to present any argument regarding the existence of the various forms, the Court finds that no valid agreement to arbitrate exists based on the facts presented.  Agri Trading itself points to two different documents (one to the arbitrator and one to the Court) that call for drastically different performances on the part of Hardy.  Based on Agri Trading's own actions, the Court itself cannot say which document contains an enforceable arbitration provision.  Accordingly, the Court finds that no valid agreement to arbitrate exists.

2.  Arbitration under Purchase Order 319298[1]

On the other hand, the Court finds that the parties must arbitrate the dispute relating to Purchase Order 319298 because a valid agreement to arbitrate exists.  The purchase order, along with the matching Sunbelt Confirmation of Purchase and Sale, indicate that the parties agreed as to the essential terms, *i.e.*, quantity of rail cars and price.  Subsequent to the documents, Hardy began performance and shipped rail cars of corn oil.  These facts show that there was an offer, acceptance, and consideration.  Accordingly, the Court finds that a valid agreement exists.

Hardy argues that it objected to the inclusion of any "terms and conditions," including the incorporation of the AFOA rules and, therefore, it never agreed to arbitration.  In support of its position, Hardy provides the declaration of David Weiss, who avers as follows:

As to each purchase order sent by Agri Trading to HIT in 2011 and 2012, I expressly told Agri Trading that [Hardy] would not agree to any additional terms and conditions in the

_____

[1]     In footnote two of Defendant's Memorandum in Opposition, Agri Trading argues that the Court should compel Hardy to participate in the existing arbitration as well as require Hardy to arbitrate the parties' dispute under Purchase Order 319298.  Because the parties fully briefed all issues, the Court will consider whether to compel Hardy to arbitrate the dispute under Purchase Order 319298.

12

purchase orders, including verbiage on the front of the purchase orders and the Terms and Conditions on the back of the purchase orders.  I also expressly told Agri Trading that [Hardy] would not sign any of the purchase orders.  True and accurate correspondence reflecting these communications are attached hereto as Exhibit 1.

The exhibits, in turn, consist of two emails, which provide as follows:

Email #1 (dated March 8,2012): We have filled railcar NDYX 123891 with AF-2 and it was our agreement that AGRI Trading was supposed to send a purchase order without any reference to any terms and conditions.  The PO you sent by email on 2/10 was 320547.

I was surprised to learn that a purchase order with terms and conditions was sent to Dan Weiss without my knowledge on 2/14 (PO=320566).  Please re-send just a purchase order without any reference to terms and conditions because as previously discussed Hardy expressly rejects those terms and conditions.  Once I have the purchase order the railcar will be immediately released.

Email #2 (dated February 1, 2012): As has been the case for all Agri Trading rail and truck shipments, we have not signed Agri Trading PO's as submitted.  If future shipments need to occur basis terms and conditions that are acceptable to both parties we will initiate the process.  However, we will not fill PO 320458 in accordance with the first page verbiage or the Term and Conditions on the back of PO 320458 for Indelible Vegetable Oil....

Upon review, the Court finds that the evidence presented by Hardy is insufficient to

demonstrate that Hardy did not agree to arbitrate disputes arising under Purchase Order 319298.

The purchase order at issue here, *i.e.*, Purchase Order 319298, is dated August 18, 2011 and the

emails relied on by Hardy post-date the Purchase Order by nearly six months.  Hardy offers no

evidence indicating that it lodged an objection prior to acceptance of Purchase Order 319298.[2]

---

[2]     Although Weiss avers that he objected to "each" purchase order sent in 2011 and 2012, the correspondence that Weiss cites to as evidence reflecting Hardy's objections post-dates the dispute at issue in this case.  Lofquist also avers that he informed Agri Trading that Hardy would "not agree to Agri Trading's terms and conditions."  In the very same paragraph, however, Alofquist acknowledges that HIT would "fill [Agri Trading's railcars] and bill Agri Trading accordingly."  It is not clear what specific "terms

Accordingly, the Court finds that the parties had a valid agreement to arbitrate disputes under this purchase order.

In addition, Hardy appears to argue that the purchase orders were not binding because the "actual" transactions typically did not comport with the terms of the purchase orders.  According to David Weiss, "sometimes Agri Trading arranged for rail cars consistent with the amount stated on its purchase order, and sometimes it did not."  (ECF 13-2 at ¶10).  Weiss also states that only sometimes did Agri Trading pay in full for the transactions.  Similarly, Eric Lofquist testified that "the pricing for the material was not fixed, Agri Trading did not always provide a purchase order for the material, Agri Trading did not always purchase the quantities that it indicated it intended to purchase, and Agri Trading did not always pay as agreed." (ECF 13-3 at ¶ 5).

Upon review, the Court finds that these arguments are not relevant to whether the parties agreed to arbitrate their disputes.  As Hardy itself admits, it sometimes requested that Agri Trading submit a purchase order confirming the parties' negotiations.  Instead, Hardy's arguments appear to relate to whether Agri Trading breached the parties' agreement.  Moreover, the Court finds it compelling that when other disputes arose, *i.e.*, those involving weight discrepancies and specification samples, Hardy itself resorted to the AFOA rules to resolve the disputes.  As such, the Court is convinced that the parties intended that the AFOA rules would apply to deliveries made under Purchase Order 319298.

--------

and conditions" Lofquist objected to.  Regardless, as set forth below, the Court rejects any claim that Lofquist specifically objected to inclusion of the AFOA rules because the parties actions directly contradict this statement.

14

The Court further rejects Hardy's argument that the arbitration provision is not enforceable because Hardy never signed Purchase Order 319298.  As this Court has recently held, the presence of signature lines on a contract does not create a condition precedent to enforceability.  *See, Beck Aluminum Int'l, LLC v. Aluar Aluminio Argentino S.A.I.C.*, 2010 WL 3260017 (N.D. Aug. 18, Ohio 2012).  Accordingly, Hardy's argument is not well-taken.

Hardy next argues that arbitration is not required because the purchase order does not itself contain an arbitration provision.  Rather, it merely incorporates "trade rules" of various organizations.[3]  A contract, however, may incorporate trade rules, which themselves contain arbitration rules.  The incorporation of an arbitration provision in this manner does not render the arbitration provision unenforceable.  *See, Hensel v. Cargill, Inc.*, unreported, 198 F.3d 245 (6th Cir. 1999).  *See also, Blanchard Valley Farmers Coop., Inc. v. Carl Niese & Sons Farms, Inc.*, 758 N.E.2d 1238, 1244 (Oh. Ct. App. 2001)(language in purchase order indicating that purchase "is made subject to the trade rules of the National Grain and Feed Association" is "clearly sufficient to incorporate the NGFA Trade Rules into the agreements.").  Here, Purchase Order 319298 expressly incorporates the AFOA rules into the document.  Those rules provide that disputes "arising under these rules, which pertain to imported and domestic vegetable oils, *shall* be settled by arbitration."

The Court disagrees with Hardy's argument that the rules do not provide for mandatory arbitration.  Hardy cites language in the AFOA rules indicating that contracting parties *may* adopt "all, some, or none" of the AFOA rules.  According to Hardy, this language renders the

---

[3]     The Sunbelt Confirmation of Purchase and Sale similarly provided that "all trades are subject to American Fats and Oils Association Trading Rules."

arbitration provision optional.  Not so.  The provision simply provides that parties are not required to adopt the AFOA rules into their contracts.  In this case, however, the parties chose to adopt the AFOA rules.  The rules, in turn, contain a mandatory arbitration provision.  As such, Hardy's citation to *Blanchard*, *supra*, is inapposite in that the arbitration provision in *Blanchard* expressly provided mandatory arbitration only if both parties are members of the trade association.  The AFOA rules at issue in this case do not contain such a limitation on the arbitration provision.  For this same reason, the Court rejects Hardy's argument that it cannot be compelled to arbitrate because it is not a member of AFOA.  The rules do not limit arbitration solely to members.[4]

Having concluded that the parties entered into a contract containing a valid arbitration clause, the Court finds that disputes arising under Purchase Order 319298 must be arbitrated.

**<u>CONCLUSION</u>**

For the foregoing reasons, Plaintiff's Motion for Immediate Stay of Arbitration and for Preliminary Injunction is GRANTED in PART and DENIED in PART.  The Court hereby stays arbitration of any disputes for the sale of corn oil to be delivered in 2012.  Those matters must be decided by this Court.  However, disputes arising under Purchase Order 319298 must be arbitrated.  The Court finds that this matter should be stayed until the resolution of the arbitration involving Purchase Order 319298.  This case is removed from the Court's active docket until

---

[4]     Nor is the Court persuaded by Hardy's argument that the language is ambiguous because it incorporates the rules of various trade organizations, depending on the commodity at issue.  It is clear that the AFOA rules govern the commodity at issue in this case.  In fact, the parties themselves resorted to these rules to resolve disputes.

such time as either party notifies the Court that the arbitration of the 2011 dispute has been resolved.

IT IS SO ORDERED.


 /s/ Patricia A. Gaughan
PATRICIA A. GAUGHAN
United States District Judge

Dated: 3/25/13

17